UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA,** Plaintiff, vs. **JAMES TAYLOR,** Defendant. | 2:22-CR-20315-TGB-DRG HON. TERRENCE G. BERG **ORDER DENYING MOTION TO DISMISS INDICTMENT (ECF NO. 62)** |

Defendant James Taylor is charged in an Indictment as a felon in possession of a firearm and ammunition in violation of 18 U.S.C. § 922(g)(1). The Court previously denied Taylor's first motion to dismiss the indictment under the Second Amendment, finding that Taylor's facial constitutional challenge to the felon in possession statute was "unsound." ECF No. 36. Now before the Court is Taylor's second Motion to Dismiss the Indictment under the Second Amendment. ECF No. 62. He contends that the Supreme Court's decision in *New York State Rifle & Pistol Association v. Bruen*, 597 U.S. 1 (2022), mandates dismissal of the charge against him because it renders the felon-in-possession statute unconstitutional under the Second Amendment as applied to him. The government has filed a response in opposition to Taylor's motion. ECF No. 67. The parties also filed supplemental briefing, as allowed by the Court. ECF Nos. 82, 83. The Court held a hearing on Taylor's motion on January 8, 2025, at which counsel for Taylor and the government appeared. The Court took the motion under advisement.

1

After careful consideration of the parties' briefs and the arguments presented at the hearing on January 8, 2025, Taylor's Motion to Dismiss will be **DENIED.**

## I. BACKGROUND

### A. Factual Background

On June 21, 2022, Defendant James Taylor was indicted for three offenses: Count I, Felon in Possession of a Firearm, 18 U.S.C. § 922(g)(1); Count II, Felon in Possession of Ammunition, 18 U.S.C. § 922(g)(1); and Count III, Felon in Possession of a Firearm, 18 U.S.C. § 922(g)(1). ECF No. 1, PageID.1–2. The allegations underlying Counts I and II arose from events on April 25, 2022. *Id.* The allegations underlying Count III occurred on April 27, 2022. *Id.*

Specifically, on April 25, 2022, Detroit Police Department ("DPD") Officers Goodman and Mahoney were on patrol when they were dispatched to the Sunoco gas station at 13300 Livernois Avenue within the Eastern District of Michigan for "shots fired in progress." ECF No. 47, PageID.427–28. Upon arrival, they canvassed the area for any victims or damaged property. *Id.* Officers Goodman and Mahoney reviewed security video and spoke with a gas station employee. *Id.* PageID.429. The employee said that the male person who fired the gunshots was a frequent patron of the gas station, and the employee knew him as "JT." *Id.* PageID.429, 446–47.

Officers Goodman and Mahoney observed the shooter on security video which showed that, at approximately 7:09 p.m. an individual, ultimately identified as Defendant James Taylor, arrived at the gas station in a gold Chevy Malibu and parked on the southside of the gas station. ECF No. 84, PageID.841–42. He wore a unique Lakers jacket. *Id*. At approximately 7:10 p.m. Taylor left the gas station parking lot in the gold Chevy Malibu and at approximately 7:13 p.m. he returned to the gas station shortly behind a red Chrysler 300 that pulled into the parking lot. *Id*. Almost immediately Taylor fired gunshots as the driver of the red Chrysler 300 exited the vehicle. *Id*. The driver of the red Chrysler 300 attempted to flee the area by running away from his vehicle. *Id*. Taylor circled around the gas station and surrounding neighborhood several times in an apparent effort to look for the driver of the red Chrysler 300. *Id*. After a short while the gold Chevy Malibu disappeared from the camera view, and it eventually pulled into a nearby alley just south of 13300 Livernois. *Id*. There, Taylor abandoned the gold Chevy Malibu. He reappeared on foot from the nearby alley still wearing the same unique clothing. *Id*. Taylor ran across the gas station parking lot and entered the driver's side of the Chrysler 300 and then he drove away. *Id*.; ECF No. 48, PageID.534–35.

Shortly after reviewing the camera footage, Officer Mahoney observed a similar red Chrysler 300 traveling westbound on Waverly and

then northbound on Livernois. ECF No. 47, PageID.444–45; ECF No. 48, PageID.534–35. Police were unable to successfully stop the vehicle. *Id.*

Officers canvassed the neighboring areas for the gold Chevy Malibu that Taylor was originally driving but abandoned before he stole the victim's red Chrysler 300 from the gas station. ECF No. 47, PageID.444–45; ECF No. 48, PageID.534–35. Police located the vehicle at 13230 Livernois in a parking lot. ECF No. 48, PageID.535. An officer looked into the vehicle's window and observed documentation for "James Taylor" inside the vehicle. *Id.* PageID.447–48.

Later that same evening, Officer Darren King conducted an initial interview of the victim. The victim provided a consistent account of what law enforcement had observed on surveillance video and described the shooter for police. The victim denied knowing who had shot at him or having ever seen that person before. The victim told police that he could pick the offender out of a line-up. ECF No. 32-3, PageID.302–03.

Based on the gas station employee's identification of the shooter as "JT" and the documentation with "James Taylor" on it within the suspect vehicle, police searched Taylor's name on April 26, 2022, and learned that Defendant James Taylor was on a GPS tether for an unrelated pending criminal case. ECF No. 47, PageID.436–37. Taylor's tether records placed him within the area of the shooting during the relevant time period. *Id.*

Detroit police believed Taylor to be responsible for the gas station shooting and, on April 27, 2022, police located him through GPS tether

tracking while he was driving a U-Haul truck with a passenger in Detroit. ECF No. 47, PageID.437–38. Police lawfully pulled Taylor over and arrested him. *Id.* As part of the warrantless arrest, the officers searched the interior of the U-Haul and found a firearm, attributing the same to Taylor. ECF No. 47, PageID.464–66, 470–71. The firearm was ultimately linked to shell casings recovered from inside the vehicle that Taylor abandoned shortly after the shooting on April 25, 2022. The officers also seized a firearm from the purse of the passenger, who had a license to carry the gun. *Id.*

Taylor's prior criminal history includes the following:

- <u>2013 (Wayne County 3rd Judicial Circuit Court, Docket No. 13001120-03-FH)</u>: Taylor plead guilty to felony Home Invasion – Second Degree. Taylor and two other men tried to break into a home using a screwdriver. Taylor violated his probation two separate times, and at least one violation was for threatening behavior towards his grandmother.

- <u>2014 (Macomb County 37th Judicial District Court, Docket No. W146230)</u>: Taylor pled guilty to misdemeanor possession of a controlled substance and was sentenced to probation under the Holmes Youthful Trainee Act ("HYTA").

- <u>2015 (Macomb County 16th Judicial Circuit Court, Docket No.15-003234)</u>: Taylor pled guilty to Stolen Property–Receive and Conceal–Motor Vehicle. He was on probation for the felony home

invasion case at the time of this new felony offense. He also violated his probation two different times, failed to appear and absconded, and his HYTA status was ultimately revoked.

- <u>2017 (Wayne County 3rd Judicial Circuit Court, Docket No. 17-006967-01)</u>: Taylor pled guilty to Felony–Attempt Weapons Carry Concealed. Here, police officers observed Taylor and other individuals loitering in the street and impeding traffic. Officers observed Taylor with open intoxicants and ultimately recovered a handgun from his pocket. Taylor failed to appear for sentencing, and he violated his probation.

- <u>2020 (Oakland County Sixth Judicial Circuit Court Docket No.20-275930-FH)</u>: The government states that Taylor was convicted of Carrying a Concealed Weapon (HAB 4th). Here, police officers pulled Taylor over for a non-moving violation. Taylor had prescription pills in his pocket and admitted that he was trying to "get high." Police also found a firearm in Taylor's possession inside of the vehicle.

- <u>2022 (Wayne County Third Judicial Circuit Court, Docket No. 22-00119-01-FH)</u>: Taylor pled guilty to Weapons Felony Firearm. The government states that police officers observed Taylor holding a firearm near a vehicle. As the officers tried to investigate, Taylor got into the vehicle and drove away while the police were dangerously near him. As Taylor drove away in a stolen vehicle, the

6

>vehicle's door hit one of the police officers. Police gave chase and Taylor hit a parked vehicle. He fled on foot and police ultimately recovered a firearm that he had discarded.

ECF No. 67, PageID.765; ECF No. 83, PageID.830–31.

In addition to Taylor's multiple felony convictions, he was on felony state probation for the weapons–concealed carry offense when he allegedly committed the instant offense on April 25, 2022. He also had multiple other criminal matters pending at that time. Per Taylor's state felony plea in Case No. 22-001119-01-FH (weapons–concealed carry) in the Wayne County Third Judicial Circuit Court on September 1, 2022, and his ultimate sentence on September 20, 2022, Taylor's other matters—21-000812-01-FH (felony stolen property and larceny), 20-004094- 01-FH (weapons felony firearm and various property or fraud crimes), and 20-004706-01-FH (felony stolen property)—were dismissed. ECF No. 83, PageID.831–32.

### B. Procedural Background

Taylor was charged in this case by an indictment filed on June 21, 2022, in Count 1 with felon in possession of a firearm for an offense that took place on or about April 25, 2022; Count 2 with felon in possession of ammunition for an offense that took place on or about April 25, 2022; and Count 3 with felon in possession of a firearm for an offense that took place

on or about April 27, 2022. ECF No. 1.[1] As explained below, Count I of the indictment has been dismissed without prejudice, and thus Taylor remains charged with two Counts of felon in possession of a firearm and ammunition in violation of 18 U.S.C. § 922(g)(1).

On March 3, 2023, Taylor filed a motion to dismiss based on claimed Speedy Trial Act, Fifth Amendment, and Sixth Amendment violations. ECF No. 19. Then, on March 6, 2023, Taylor filed a motion to dismiss the indictment under the Second Amendment, asserting a facial challenge to the felon in possession statute. ECF No. 22. The Honorable Judge Robert H. Cleland denied Taylor's motions on April 26, 2023. ECF No. 36. Judge Cleland found that Taylor failed to establish a pre-indictment delay in this case under either a Speedy Trial Act or a Fifth Amendment violation theory. He further found that Taylor's constitutional challenge to the charges against him under the Second Amendment is wholly without merit. *Id.*

Taylor also previously filed two motions to suppress evidence. ECF Nos. 21, 32. Taylor asked the Court to find that his April 27, 2022 arrest was unlawful and sought to suppress all evidence seized and statements obtained as fruit of that alleged unlawful arrest. ECF No. 21. He also sought suppression of all evidence seized during the execution of a search

---

[1] This case was originally assigned to the Honorable Robert H Cleland, who presided over this case until July 31, 2023, at which time this case was reassigned to the Honorable Paul D. Borman. On November 20, 2023, this case was reassigned to the undersigned. ECF No. 68.

warrant on the target vehicle (the gold Chevy Malibu) in this case as well as all other fruits obtained as a result. ECF No. 32. The Court held evidentiary hearings on May 2, 2023 and May 18, 2023, ECF Nos. 47, 48, and allowed the parties to file supplemental briefing. ECF Nos. 38, 41, 43. The government also filed an unopposed motion to voluntarily dismiss without prejudice Count I of the Indictment. ECF No. 44.

On May 24, 2023, Judge Cleland entered an order granting the government's motion to voluntarily dismiss Count I of the Indictment. ECF No. 45. That Order also denied Taylor's two motions to suppress evidence. The Court denied Taylor's first motion "[f]or the reasons as stated on the record," and stated "[a]s to Defendant's second motion to suppress," that Taylor "possessed no Fourth Amendment 'standing' to challenge the propriety of the search and seizure of the target vehicle [the gold Chevy Malibu]" because he abandoned that vehicle. *Id.* (concluding that Taylor's "abandonment of the gold Chevy Malibu prevents him from now attacking any search of the vehicle").

## II.  LEGAL STANDARD

### A. Dismissal of Defective Indictment

A defendant may seek dismissal of a defective indictment in a pretrial motion under Federal Rule of Criminal Procedure 12(b)(3).

9

## B. Second Amendment and Felon-in Possession Laws

The Second Amendment provides that, "[a] well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. For the first two centuries after its adoption, the Second Amendment was generally understood to concern the maintenance and preservation of a militia for the common defense of the people. *See, e.g., United States v. Miller*, 307 U.S. 174, 178–79 (1939) (concluding that the Second Amendment did not protect the right of an individual to possess a "shotgun having a barrel of less than eighteen inches in length" because there was no evidence that such a weapon "could contribute to the common defense"). In *District of Columbia v. Heller*, 554 U.S. 570, 628 (2008), the Supreme Court for the first time interpreted the Amendment to find in it an "inherent" right of every law-abiding American citizen to bear arms in defense of *self*. But it cautioned that, "[l]ike most rights, the right secured by the Second Amendment is not unlimited," and expressly noted that "longstanding prohibitions on the possession of firearms by felons" were "presumptively lawful." *Id.* at 626–27.

While *Heller* did not articulate a framework for courts to apply in considering challenges to the constitutionality of regulations implicating the Second Amendment, the Supreme Court did so in *New York State Rifle & Pistol Association v. Bruen*, 597 U.S. 1 (2022). That framework has two steps. First, a court must evaluate whether the government can

10

rebut the presumption that the Second Amendment protects the challenged gun-possession conduct. *Bruen*, 597 U.S. at 24. Second, the court must evaluate whether the government can justify the challenged regulation by demonstrating that it is "consistent with the Nation's historical tradition of firearm regulation." *Id.* In its most recent Second Amendment case, *United States v. Rahimi*, 602 U.S. 680 (2024), the Supreme Court again reiterated *Heller*'s admonition that prohibitions "on the possession of firearms by 'felons and the mentally ill' are 'presumptively lawful'" and explained they were consistent with founding-era regimes that disarmed individuals who posed a "clear threat of physical violence" to others. *Id.* at 698–99.

Recently, under *Bruen*'s framework, the Sixth Circuit held that felons are among "the people" protected by the Second Amendment and concluded that § 922(g)(1)'s ban on felons possessing firearms was facially consistent with the Second Amendment. *United States v. Williams*, 113 F.4th 637, 657 (6th Cir. 2024). After exploring the history of gun regulation, the Sixth Circuit found that "our nation's history and tradition demonstrate that Congress may disarm individuals they believe are dangerous," *id.* at 657, and that § 922(g)(1) "is constitutional on its face and as applied to dangerous people," *id.* at 662–63.

The Court makes the determination as to whether a defendant's background and prior convictions show that he is dangerous so that the general rule prohibiting felons from possessing firearms may be

11

constitutionally applied to a particular defendant. The defendant bears the burden to show he is not dangerous and thus falls outside of § 922(g)(1)'s constitutionally permissible scope. *Id.* at 662. The dangerousness determination is "fact-specific, depending on the unique circumstances of the individual defendant," including the person's "entire criminal record," such as any evidence of past convictions in the record. *Id.* at 659–60.

The Sixth Circuit, in particular, recognized that "certain categories of past convictions are highly probative of dangerousness, while others are less so." *Id.* at 658. In doing so, the Sixth Circuit described a three-tiered analytical framework for evaluating the dangerousness of prior convictions. While courts need not find a "categorical match to a specific common-law crime" to establish that an individual is dangerous, the *Williams* court identified three broad categories of crimes: (1) crimes against the person—which would include violent crimes such as murder, rape, assault, and robbery; (2) crimes that pose a significant threat of danger to others, such as drug trafficking and burglary, where the nature of the crimes create the possibility of a violent confrontation; and, (3) crimes like mail fraud and making false statements, which "cause no physical harm to another person or the community." *Id.* at 658–59. As to the first two types of crime, the Sixth Circuit explained that "[a]n individual in either of those categories will have a very difficult time, to say the least, of showing he is not dangerous," *id.* at 663, while the kinds

12

of crimes falling into the third category do not necessarily "make a person dangerous." *Id.* at 659.

The above analysis suggests that if a defendant charged with § 922(g)(1) has a prior felony conviction that fits in the first two categories, a court would be justified in finding that he was dangerous and therefore would be prohibited from possessing a firearm. But to say that is not to say that defendants who committed crimes less clearly violent or likely to result in danger to others are automatically to be considered "non-dangerous." Indeed, the Sixth Circuit made it clear that "[w]hen evaluating dangerousness, a court may consider a defendant's entire criminal record—not just the specific felony underlying his § 922(g)(1) conviction.... Courts may consider any evidence of past convictions in the record, as well as other judicially noticeable information—such as past convictions—when assessing a defendant's dangerousness." *Id.* at 659–60. Judicially noticeable facts are facts "not subject to reasonable dispute" because they are "generally known" or "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). The Sixth Circuit noted that prior convictions can be accepted "without an evidentiary hearing or jury fact finding" and that a presentence report whose contents have not been objected to can also be so considered. *Id.* at 662 (citing to *Almendarez-Torres v. United States*, 523 U.S. 224, 228–39 (1998)). It recognized "courts may wish to consider information beyond

13

criminal convictions," such as a civil restraining order, but left open the question of what information is "relevant." *Id.* at 659 n.12.

Applying the dangerousness rule to the case before it, the Sixth Circuit concluded that § 922(g)(1) may be constitutionally applied to Williams because he had previously been convicted of two felony counts of aggravated robbery with a deadly weapon—which the court noted would be "sufficient to conclude that Williams, if armed, presents a danger to others or the public"—as well as attempted murder and possession of a firearm as a felon. *Id.* at 662. The court noted that "[t]he government could've pointed to any one of those convictions to demonstrate his dangerousness." *Id.* Interestingly, the court included Williams' prior conviction *for felon-in-possession of a firearm* as the kind of felony that demonstrates dangerousness. The Sixth Circuit thus sees felon-in-possession, which is not a crime against a person, as falling in the second category of crimes which, like drug trafficking or burglary, carries with it the possibility that violence or harm to others might occur during its commission.

More recently, the Sixth Circuit held that § 922(g)(1) was constitutional against a defendant's "as applied" challenge where the defendant had multiple prior convictions punishable by imprisonment for more than one year that included 2019 convictions for operating a motor vehicle under the influence of alcohol/drugs (fourth offense), driving under the influence on a suspended license, and possession of a controlled

14

substance. *United States v. Goins*, 118 F.4th 794, 796 (6th Cir. 2024). Goins' state sentence in 2019 included a four-year sentence of probation, which included the condition that he not possess a firearm. *Id.* He was subject to that probationary condition at the time he possessed the firearm in question in his federal case. *Id.* The Sixth Circuit found § 922(g)(1) constitutional as applied to Goins because the nation's historical tradition of firearms regulation "demonstrates that Congress may lawfully disarm probationers like Goins, who (1) are under a firearm possession limitation as a condition of probation, (2) are under a relatively short probation sentence for a dangerous crime, and (3) whose repeated and recent actions show a likelihood of future dangerous conduct." *Id.* at 797.

### III.  DISCUSSION

Taylor argues that although a felon he is not a "dangerous person" and that consequently § 922(g)(1)'s prohibition of firearms possession is unconstitutional as applied to him.

The Court may consider the defendant's "entire criminal record" when determining dangerousness in connection with an as-applied challenge to § 922(g)(1). *Williams*, 113 F.4th at 659. Taylor acknowledges his extensive criminal history but argues that he is nevertheless not a "dangerous person" because the only conviction constituting a "crime[] against a person" is his home invasion conviction which is over ten years old, and which he committed when he was 17 years old—a juvenile.

15

*Williams* gives no specific guidance as to whether, in making the dangerousness decision, district courts should give less weight to juvenile convictions. Brain development and neuroscience, however, strongly suggest they should be given less weight: it is clearly established that young people's brains are not fully developed such that they are more likely to act impulsively and recklessly, to be vulnerable to negative influence and peer pressure, and to lack a sense of responsibility and the ability to understand long-term consequences. *See Miller v. Alabama*, 567 U.S. 460, 471–72 (2012); *see also Graham v. Florida*, 560 U.S. 48, 68 (2010) ("Juveniles are more capable of change than are adults, and their actions are less likely to be evidence of 'irretrievably depraved character' than are the actions of adults.") (citing to *Roper v. Simmons*, 543 U.S. 551, 570 (2005)).

Thus, while a court can consider an individual's "entire criminal record" in determining dangerousness under *Williams*, courts should be wary of giving too much weight to offenses committed as a juvenile or finding dangerousness based on juvenile convictions alone. Regardless, under *Williams*, the burden is on Taylor to prove he is not dangerous. *Williams*, 113 F.4th at 662. If the juvenile conviction for home invasion was Taylor's only prior conviction, and if in the intervening years he had proven himself to be a model citizen, Taylor might be able to carry his burden of showing non-dangerousness. He cannot do so however here because, as discussed in detail above and as discussed at the hearing on

16

this motion, Taylor's criminal record details an escalating pattern of felony conduct and dangerous behavior, including conduct involving firearms that resulted in his HYTA status being revoked. Moreover, he repeatedly violated the terms of his probation, failed to appear for sentencing, and absconded. And importantly, he was on felony state probation for weapons-concealed carry when he was allegedly involved the instant offense on April 25, 2022, which involved firing a gun at another person. He also had multiple other criminal matters pending at the time. *See Goins*, 118 F.4th 804 (defendant's "repeated actions demonstrate[] a likelihood of future dangerous conduct"); *see also United States v. Pickett*, No. 3:22-cr-00014-2, 2024 WL 4854738, at *3 (M.D. Tenn. Nov. 21, 2024) (concluding that "even where, as here, a defendant's 'crimes are old, the *repeated nature* of his drug trafficking offenses indicates dangerousness.'"); *United States v. Bell*, No. 2:20-cr-29336, 2024 WL 4589812, at *5 (E.D. Mich. Oct. 28, 2024) (Drain, J.) ("the repeated nature of [the defendant's] drug trafficking offenses indicates dangerousness.").

This Court previously found by clear and convincing evidence that there is significant evidence that Taylor is a danger to the community "[g]iven the violent nature and potentially lethal circumstances surrounding the instant charges, Taylor's history of failing to comply with terms of supervision, and a lengthy criminal history of dangerous conduct[.]" ECF No. 71, PageID.792. The Court here similarly finds,

17

based on the totality of the circumstances, that Taylor's conduct meets the dangerousness requirement necessary for § 922(g)(1) to apply to him.

After considering Taylor's criminal history as a whole, the Court concludes that § 922(g)(1)'s prohibition of convicted felons from possessing firearms[2] is constitutional as applied to him and supports the conclusion that Taylor, "if armed, presents a danger to others or the public" for purposes of § 922(g)(1). Taylor offers no convincing evidence

---

[2] In other opinions, this Court has indicated its disapproval of the terms "disarmament" and "rearmament" to refer to the enforcement of our federal law's prohibition of firearms possession against previously convicted felons and situations where that law has been found unconstitutional as applied. An individual is not "disarmed" because a reasonable law prohibits that person from possessing a firearm. That person is simply not permitted by law to have a gun. Disarming someone means taking the weapon from their hands. Using that term, as well as "rearmament," assumes a default position that every person is carrying a gun—therefore if it becomes illegal for a person to carry a gun, the person is "disarmed." According to a 2023 survey by the Pew Research Center, approximately 32 percent of American adults own firearms. See https://www.pewresearch.org/social-trends/2017/06/22/the-demographics-of-gun-ownership/ (last visited, January 12, 2025). For most people, then, a federal law restricting firearms possession does not "disarm" them; they were not armed in the first place. Most people aren't. Using these terms may encourage a vision of an armed society appealing to certain political factions, but it is not a correct use of the word. To become "armed," a person has to make a decision to obtain and possess a firearm, just as a person makes a decision to obey or disregard the law. Congress is not involved in some scheme to "disarm" the people—its laws are a valid exercise of the people's representatives to enact legislation— and the prohibition of felons possessing firearms represents a reasonable such exercise until the Supreme Court clearly says that it violates its more recent interpretation of the Second Amendment.

that would undermine such a finding; he fails to meet his burden to demonstrate that he is "not dangerous." *See Williams*, 113 F.4th at 657. Taylor's as-applied challenge therefore fails.

## IV. CONCLUSION

For the reasons set forth above, Taylor's motion to dismiss the indictment, ECF No. 62, is **DENIED.**

**IT IS SO ORDERED.**

Dated: January 13, 2025    /s/Terrence G. Berg
                            HON. TERRENCE G. BERG
                            UNITED STATES DISTRICT JUDGE